UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 20-81885 |
| | ) | |
| James M. Foster, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Judge Lynch |
| | ) | |
| | ) | |
| Richard Harris and | ) | |
| Judith Harris, | ) | Adversary No. 21-96005 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| James M. Foster, | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OPINION

For several years James Foster operated home repair and storm remediation businesses.  In 2015, the plaintiffs Richard and Judith Harris entered into an agreement with one of his companies, Element Restoration and Construction Co. Inc. ("Element Restoration"), to repair storm damage to their home.  Before any work began, Mrs. Harris gave the Debtor her personal check for the installation of a new roof, gutters, and siding.  It is not disputed that at least a portion of the work was completed.  Element Restoration performed some work to remediate water damage and a new roof was eventually installed by a subcontractor.  It is undisputed that Foster did not pay the subcontractor and the subcontractor did not install the siding, though the parties dispute the reason the subcontractor did not continue the work and the Debtor's involvement at that point.  After Foster failed to refund their payment, the Harrises took Foster and Element Restoration to

Page 1 of 29

court.   On January 8, 2018, the Harrises obtained a default judgment for $26,237.44. Around that time, Element Restoration had ceased operating.

On November 18, 2020, Mr. Foster filed a petition for relief under chapter 7 of the Bankruptcy Code.   Mr. and Mrs. Harris bring this adversary proceeding to oppose his discharge and, alternatively, to seek a determination that their judgment is non-dischargeable.   The adversary complaint argues for exempting the judgment debt from discharge under 11 U.S.C. § 523(a)(2)(A) (Count I), § 523(a)(2)(B) (Count II) and § 523(a)(6) (Count III).   The Harrises also object to bankruptcy discharge under 11 U.S.C. § 727(a)(2)(A) (Count IV), § 727(a)(3) (Count V), § 727(a)(4)(A) (Count VI), and § 727(a)(7) (Count VII). However, as discussed below, the Plaintiffs have failed to pursue Counts II, III, and VII.

The matter is now before the court for ruling after trial on the remaining counts. Having considered the witnesses' testimony, the stipulations of the parties, and the oral and written argument of counsel, the court finds for the reasons discussed below that the Plaintiffs failed to satisfy their burden with respect to their remaining counts.   A separate judgment order will be entered pursuant to Bankruptcy Rule 7058.

## JURISDICTION

Discharge is a right that is expressly created by title 11 and would have no existence if not created by the Bankruptcy Code.   Thus, proceedings on an objection to a debtor's discharge arise in a case under title 11. *See Kontrick v. Ryan*, 540 U.S. 443, 453 (2004) ("Congress authorized bankruptcy courts to adjudicate, inter alia, objections to discharge."). The determination of the dischargeability of a particular debt is a core proceeding under 28

U.S.C. § 157(b)(2)(I) and (J), and actions to determine the scope of a debtor's discharge is a fundamental part of the bankruptcy process.  As such, this court possesses "constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case." *Muhummad v. Reed (In re Reed)*, 542 B.R. 808, 815 (Bankr. N.D. Ill. 2015); *see also, e.g.*, *In re Yotis*, 521 B.R. 625, 631 (Bankr. N.D. Ill. 2014) (citing *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011)).  This court, therefore, has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  Additionally, both parties acknowledged and consented to the authority of this court to enter final orders and judgments in this case pursuant to *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

## PROCEDURAL BACKGROUND AND FINDINGS OF FACT[1]

### A.  Procedural Matters

After an opportunity for discovery, the deadline for which was extended by the court several times at the request of the parties, the parties submitted factual stipulations. (ECF No. 76.)  The court held a trial on the adversary complaint on May 10, 2022, via the court's video teleconference platform pursuant to Fed. R. Civ. P. 43(a) (made applicable by Fed. R. Bankr. P. 9017) and this court's Third Amended General Order No. 20-05.  During the trial the court heard from Plaintiff Judith Harris, Defendant James Foster, and William Petsche, the Plaintiffs' attorney in both the adversary proceeding and underlying state court action.

---

[1] The following findings, together with those set out in the "Discussion" below, set forth the court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Mr. Harris did not testify.[2]   The court received into evidence eighteen exhibits[3] and the parties' stipulations. (ECF No. 76.)  The court also takes judicial notice of its own docket. *See, e.g., Levine v. Egidi,* No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993).  At the beginning of trial, the court instructed the parties to submit post-trial memoranda after the hearing in order to afford the parties the opportunity "to make as complete and factual a record as possible." (Tr. at 19; *see also id.* at 158-59)  The court twice granted requests to extend the deadlines for the post-trial briefs, which eventually were filed and were considered by the court in reaching its decision.

### B.  Findings of Fact

#### 1.  The Agreement to Repair the House.

The parties stipulate that on or about October 21, 2015, the Plaintiffs entered into a written contract with Element Restoration for installation of a new roof and new siding at their residence in Lake in the Hills, Illinois. (ECF No. 76 ¶¶ 10, 12, 14.)  At the time, Element Restoration was owned by the Debtor. (*Id.* ¶ 12.)  The Plaintiffs paid Element Restoration $13,170.39 by check on or about the same date. (*Id.* ¶ 13.)  Element Restoration served as the general contractor for the roofing and siding project and, in turn, it hired a subcontractor to provide the labor. (*Id.* ¶¶ 1-2.)  The parties further stipulate that "[n]either

---

[2] He was listed as a potential witness.  At the beginning of her testimony, Mrs. Harris claimed that her husband experiences onset dementia and has difficulty walking, suggesting that her husband was home with her and available to testify, but "that may take some time."  Neither party called Mr. Harris to testify.  While the parties informed the court at the October 2021 status hearing that Mr. Harris had been deposed, neither sought to present his transcript into evidence.

[3] One exhibit, marked as Plaintiffs' Exhibit Q, purportedly an indictment document, was offered but not received, the court sustaining the objection to its relevance.  The court overruled the relevance objection to certain Facebook posts contained in Plaintiffs' Exhibit T.

Defendant nor Element Restoration paid the subcontractor because of the subcontractor's failure to complete the job." (*Id.* ¶ 3.)

Sometime in 2016, the Plaintiffs filed a complaint in McHenry County, Illinois, case number 16 AR 279. (*Id.* ¶ 15.)  They obtained a default judgment against the Debtor on January 8, 2018 for $13,170.39, plus $10,000 punitive damages and $3,457.05 attorney fees for a total amount of $26,627.44. (*Id.* ¶ 16.)  "No issues were litigated" in the state court proceedings and the Debtor was not present when the default judgment was entered. (*Id.*) The Debtor did attend a citation proceeding to enforce the judgment that was conducted before the state court on October 15, 2020. (*Id.* ¶ 17.)  On November 18, 2020, Mr. Foster filed his bankruptcy petition. (*Id.* ¶ 18.)

The document which the parties generally refer to as "the contract" is dated October 21, 2015.  It was signed by Richard Harris and by the Debtor on behalf of Element Restoration. (Ex. 2.)  The court notes that this document in fact does not expressly recite material terms of a home repair contract, such as the price to be paid the contractor, timeframes for performance, or a description of the work to be performed.  Instead, Exhibit 2 states that Mr. Harris does "authorize and direct Element Restoration and Construction Co., Inc. (Element) to proceed with the recommended procedures to preserve, protect, and secure the property from further damage caused by Hail [sic]."  The remainder of the document discusses Element Restoration's right to be paid by the Plaintiffs' insurance provider.  This so-called "contract" contains no representations or warranties by either party.

The parties presented little evidence about their communications, if any, before signing this contract. As noted, Mr. Harris did not testify. Mrs. Harris testified that she only communicated with the Debtor "one time." That took place when the Debtor insisted on receiving payment before the parties signed their contract. She did testify that she asked Mr. Foster if she could make an initial partial payment to which he responded that he "want[ed] the whole check . . . [because] he had to buy material." (Tr. at 25.) Mrs. Harris told the court that she "assumed" the Debtor would personally perform all work "because it was his company" and he "gave [her] the impression that he was in charge, period." She admitted, however, that "nothing was mentioned" regarding whether subcontractors would be brought in for the project. (*Id.* at 26.) Mrs. Harris did not claim that she had negotiated or was present for any discussion about what work would be performed before the contract was signed.[4]

The Debtor testified that he deposited the entire $13,170.39 payment into his business checking account. (*Id.* at 40.) He told the court that he used some of the deposited funds to purchase materials for the job. (*Id.*) The parties stipulated to Debtor's Exhibit 3, a "Warehouse Picking Ticket" from ABC Supply Co. Inc. which purports to show Element Restoration's order dated April 13, 2016, for building supplies for a total price of $2,828.25 to be delivered to the Harris residence. During cross-examination, the Debtor stated he was "not sure" how much of the sum deposited from the Harris' check remained in the business account after the materials were purchased. (*Id.*) Nor could he say what happened to the

---

[4] "Q: And going back to the transaction, and in addition to the contract that you had with Mr. Foster, did Mr. Foster make any other assurances to you at the time? A: I only was in contact with him one time, is when he wanted the check." (Tr. at 24-25.)

remaining funds.  According to Foster, as of the date of trial, his business was closed, or in his own words, by then he no longer "had" that account.  (*Id.* at 41.)

Mrs. Harris generally denied – without any specificity as to dates – that "the person that came out to do the work" was the Debtor but acknowledged that while she was aware of people at the jobsite ("thought everybody was out there"), she "had no idea who." (*Id.* at 27.)  She also acknowledged that the "roof did get finished . . . and that was done after a couple of days" so she "thought he was starting to get things done." (*Id.*)  The Debtor testified, without contradiction, that he went to the Plaintiffs' residence the day after receiving the check for the color selection for the siding and roofing, handled the Plaintiffs' supposed change of heart regarding their color order, and that he dropped off materials for the roofing and was present at the Harris property the first day of work in April 2016. (*Id.* at 37-38.)

The Debtor also testified that his company performed mold removal in the building's interior and subcontracted with a company named Restoration Doctor to install roofing, gutters, fascia, skylights, and siding. (*Id.* at 35, 38-39.)  The subcontractor did the roofing work, but the Debtor claimed that he dropped off material and inspected the project, personally visiting the premises on at least fifteen occasions. (*Id.* at 114.)  Mr. Foster told the court that Restoration Doctor completed the roofing work, but not the siding work, and – consistent with the parties' stipulation – that Element Restoration did not pay Restoration Doctor because of the subcontractor's failure to do that work. (*Id.* at 153, 155; ECF No. 76 ¶ 3.)

The Plaintiffs admitted that roofing materials were delivered to their home but could not recall the exact date when the material was delivered. (Ex. 8.) Performance, at least partial performance, is also corroborated by the June 10, 2016, demand letter sent by the Plaintiffs' attorney to the Debtor. (Ex. 4.) In it, Mr. Petsche wrote: "After completing the roof replacement [Mr. Foster has] refused to come and complete the siding replacement." Reciting that "$7,336.00 was for the roof replacement," the letter asserts that "$5,834.39 is due and owing from you to the Harris's." (*Id.*) The Debtor also offered into evidence, without objection, a second letter dated July 5, 2016, from Restoration Doctor to the Debtor at Element Restoration. (Ex. 5.) In it the subcontractor demanded $3,188.00 as payment in full for Restoration Doctor's roofing work at the Harris' home, threatening to sue the Debtor if it is not paid. Although it is undisputed that the Debtor never paid the subcontractor, no evidence was presented, and it has not been argued, that Restoration Doctor has attempted to enforce its claim against the Plaintiffs.

The parties offered contradictory accounts of how the work on the house ended. Mrs. Harris' son was employed by the Debtor around the time of the project. The Debtor claims that some kind of physical altercation between him and the son occurred two days after the work on the roof began, which at some point was brought to the attention of the local police. The Debtor claims that during the ensuing chain of events, he fired Mrs. Harris' son, and the Harrises terminated Element Restoration. According to the Debtor's uncorroborated account, he understood that he could no longer go onto the Harrises' property. (Tr. at 38, 116.) That noted, the court finds the testimony about his state of mind regarding this to be of questionable credibility and scant probative value.

Page 8 of 29

Mrs. Harris furnished little to no detail about the construction work. She testified that after the roof was complete she "figured everything else would follow, but nothing followed." (*Id.* at 27.) She also testified that she communicated with the Debtor only a single time, a conversation which occurred, according to her, before the contract was signed.[5] (*Id.* at 24-25.) She did not claim that she had personal knowledge about the subcontractor's work on the house when the work stopped. Rather, Mrs. Harris testified that eventually someone else was hired to finish the siding job for which she and her husband "put out . . . more than 7,000." She further told the court that she eventually received some reimbursement from her insurer for an unspecified amount, but that the Harrises "paid the rest." (*Id.* at 28.)

2.   Mr. Foster's Finances and 2020 Bankruptcy Filings.

The evidence presents a disjointed account of the Debtor's financial situation before his bankruptcy. The Debtor testified without contravention that he was not employed when he filed his petition in November 2020 and did not have any income in 2020. At the time, he claimed, he "was dealing with a broken leg . . . [and] was off work for a while." (*Id.* at 44.) As for Element Restoration, the Debtor stated that he "started" that company around 2005. (*Id.* at 49.) Although he claimed to have difficulty recalling specific dates, Foster claimed to remember that Element Restoration stopped doing business in 2019.[6] (*Id.* at 47.) In June

---

[5] Curiously, she did claim to have attempted to call the Debtor on four or five occasions to request a refund but was unable to reach him. She was not asked to explain her seemingly cryptic assertions that while the Debtor "kept on saying call me Wednesday" she "communicated with him only a single time." (Tr. at 28.)

[6] According to his tax return, the Debtor also was employed at times in 2018 by Allen Restoration Group located in Lombard, Illinois. (Ex. O.) He listed "Estimator" as his position there. (*Id.*)

2019, Foster and James Sonsalla formed a Florida limited liability company, Mildew911 LLC ("Mildew911"), with the Debtor owning 75% and Sonsalla owning 25%. (Ex. N.)  The Debtor told the court that Mildew911 stopped operating around 2020, at which time the Plaintiffs were attempting to enforce their state court judgment. (*Id.* at 47-48.)

The Debtor admitted receiving approximately $5,000 sometime in 2020 in connection with a personal injury claim.  At trial he was unsure what exactly he did with that money suggesting that he may have used it to pay attorneys representing him in various civil suits and for the $1,750 retainer paid to his bankruptcy counsel. (*Id.* at 83.)

Mildew911 maintained a business deposit account at "Azlo."  The Plaintiffs offered into evidence Azlo statements for mid-2020. (Ex. P.)  According to the statements, the account balance was $0.00 on June 1, 2020, and $2.72 on September 30, 2020.  A total of $14,814.92 was deposited and $14,812.20 withdrawn from the account during those four months. (*Id.* at 89-90.)  The Debtor testified without contravention that, sometime in 2020, the Debtor paid the remaining $2.72 to the Plaintiffs' counsel after which Mildew911 was dissolved.  Foster told the court that he never received any income from Mildew911. (*Id.* at 47, 109-10.)  He claimed that all withdrawals from the Azlo account were for the company's business expenses with the exception of $428 that Mildew911 paid on August 24, 2020, to McHenry County for a body attachment that personally benefitted the Debtor. (*Id.* at 110-11.)  The Debtor testified that he "talked to my partner [at Mildew911] and he said just pay it" since it was necessary for the Debtor "to get out of jail." (*Id.*)

The Debtor's bankruptcy schedules list Foster's 75% interest in Mildew911 as an asset valued at "$0.00" and the Azlo account value at $2.72. They disclose his total assets and liabilities respectively to be $5,782.94 and $127,578.06. The assets listed include $5,084.22 in cash, described as "Proceeds from Personal Injury settlement." Foster claimed a personal injury exemption against the settlement proceeds under 735 ILCS 5/12-1001(h)(4) and applied his Illinois "wildcard" exemption under 735 ILCS 5/12-1001(b) against his remaining $708.72 of scheduled assets. His schedules disclose that Sonsalla holds an undisputed unsecured claim for $20,000, and that the Harrises are unsecured creditors with a judgment claim of $26,627.44. The Debtor's filings also state that he is unmarried with one minor dependent son who does not live with him and that both his current monthly income and monthly expenses are "$0.00."

The Debtor's Statement of Financial Affairs states that his 2020 gross income was "$0.00" as of the petition date and claims "$0.00" to be his gross income for calendar year 2019.[7] His statement discloses that he held an interest in Mildew911 from June 17, 2019 to the date of petition, and that he owned Element Restoration, Inc. from "July 20, 2015 to November 25, 2019 – SOS Involuntary Dissolution" and owned Element Restoration and Construction, Inc. from "July 12, 2010 to January 30, 2018 – SOS Involuntary Dissolution." It also disclosed ten lawsuits involving Foster as a plaintiff or defendant within a year pre-petition and lists his $1,750.00 payment to his bankruptcy attorney on November 11, 2020.

---

[7] The Plaintiffs offered into evidence the Debtor's self-prepared federal tax returns only for year 2018. (Ex. O.) These disclose wages for 2018 of $10,070 from his employment as an estimator. Yet nowhere do the Plaintiffs identify in the Debtor's bankruptcy schedules or statements any statement he made regarding income received in 2018.

During the course of trial, the Plaintiffs elicited some testimony regarding other payments and potential income relating to items not listed in Foster's bankruptcy filings, such as for a DUI charge, fees paid for criminal defense counsel pre-petition, and bail, fines and "restitution" arising from a 2017 fraud case.  None of these items were shown by the Plaintiffs to involve assets of the estate or post-petition transactions.

The chapter 7 trustee filed a report of no distribution on January 27, 2021.

## CONCLUSIONS OF LAW

### A.  Objections to Discharge Under Section 727(a)

One of the primary purposes and benefits of bankruptcy is to provide a "fresh start" through discharge of debts. *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (quoting *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003)).  On the other hand, discharge is reserved for the "honest but unfortunate debtor," and therefore the Bankruptcy Code in section 727(a) provides several grounds to object to "the privilege of discharge to dishonest debtors." *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)).  Exceptions to discharge are generally "construed strictly against a creditor and liberally in favor of the debtor," and therefore an objector to discharge "must establish grounds for denial of discharge under 11 U.S.C. § 727(a) by a preponderance of the evidence." *Id.* at 978-79.

### 1.  The Section 727(a)(2)(A) Claim (Count IV).

Section 727(a)(2)(A) provides grounds to object to discharge if:

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
the estate charged with custody of property under this title, has transferred,

removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2)(A).  "This exception to discharge has two elements: 'an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay or defraud a creditor).'  Both elements must have been present during the year before bankruptcy; anything earlier is 'forgiven.'" *In re Olbur*, 314 B.R. 732, 742 (Bankr. N.D. Ill. 2004) (quoting *In re Kontrick*, 295 F.3d 724,736 (7th Cir. 2002)).  To satisfy the first element the objector must demonstrate that the debtor actually intended to hinder, delay, or defraud a creditor.  A debtor's "intent to defraud must be actual and cannot be constructive." *In re Kempff*, 847 F.3d 444, 448 (7th Cir. 2017) (quoting *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002)).

Count IV of the Plaintiffs' complaint does little more than parrot the language of section 727(a)(2)(A), pleading "Within one year of filing Foster's petition in this underlying bankruptcy matter, Foster transferred, removed, destroyed, mutilated, and/or concealed property with the intent to hinder, delay, or defraud Plaintiffs in post-judgment collection proceedings." (ECF No. 1 ¶ 27.)  Nowhere have they alleged, let alone demonstrated, the "destruction" or "mutilation" of property of the estate.  Their post-trial brief instead argues with respect to the section 727(a)(2)(A) claim that the Debtor had an interest in Mildew911, that the entity conducted business during 2019 when it "was earning income and incurring expenses," and that the Debtor "concealed" this income when he listed his *personal* income

as $0.00 for the calendar year 2019 in his Statement of Financial Affairs.[8] (ECF No. 84 at 3.)   This argument is based upon the Debtor's negative response to question 4 of his Statement of Financial Affairs which asked: "Did you have any income from employment or from operating a business during this year or the two previous calendar years?"[9] (Ex. U.)

A fundamental problem with the Plaintiffs' argument is that, even if Mildew911 had received income in 2019, the Plaintiffs did not present any evidence that the income of Mildew911 was the Debtor's property.   According to its articles of formation, Mildew911 was organized in Florida as a limited liability company on June 27, 2019. (Ex. N.)   The Debtor was not its sole principal: the company's Operating Agreement lists the Debtor as its 75% owner with Sonsalla owning the remainder and its articles state that both the Debtor and Sonsalla are authorized to manage the business.   There is no evidence that the status of the two members ever changed.   Nor have the Plaintiffs offered any support for their argument that any revenue received by the limited liability company may be imputed to the Debtor's personal income, much less to explain how the absence of company revenue

---

[8] Although it was not raised by the Plaintiffs in their post-trial brief, in connection with the section 727(a)(2)(A) count the Debtor mentions in his post-trail brief his being questioned about a truck allegedly used in connection with Element Restoration's business in 2017 and his role in helping his mother sell another truck owned by her husband after his death and selling her house in 2021.   However, no evidence was presented that the business truck was transferred within one year of the petition or that the Debtor held any interest in either the other truck or his mother's house at or around the time those items were sold.

[9] Since the Debtor's petition was filed in November 2020, to fully the answer the question he should have listed his income to date for calendar year 2020, for calendar year 2019 *and* for calendar year 2018.   The Debtor may have misunderstood this question and question 5, as he provided information for only 2019 and 2020, listing "$0.00" for each.   However, no evidence was offered about the circumstances of his answering this question or completing the form.   Nor did the Plaintiffs address the Debtor's failure to list 2018 income in their post-trial brief.

in the Debtor's schedule of his personal income constitutes an intentional omission under section 727(a)(2)(A).

The Plaintiffs offered no proof, for example, that the Debtor received any salary or dividends from Mildew911. Indeed, they have not shown that the company was even solvent when it received revenue, let alone that the Debtor had a right to be paid from such revenue. The Debtor testified without contravention that Mildew911's expenditures involved the company's business purposes. The one possible exception that was identified at trial concerned his co-owner's authorization of the company's $428 payment to McHenry County in connection with a body attachment issued against Foster. While that may well have personally benefitted the Debtor, he testified without contravention that he "talked to my partner [at Mildew911] and [Sonsalla] said just pay it" because it was necessary for Foster "to get out of jail." (Tr. at 96.) This suggests, if anything, that the Debtor did not have a "right" to such funds, but rather they were the company's to expend as it determined to be in its business interest. Furthermore, even if the court could presume that this payment constituted income to the Debtor in 2020, the Plaintiffs did not present any evidence tending to show that the Debtor knew such benefit constituted "gross income" to him when he answered question 4 or that its nondisclosure was fraudulently intended.

Accordingly, the court finds that the Plaintiffs have failed to meet their burden with regard to Count IV and the Debtor will not be denied a discharge under section 727(a)(2)(A).

2.   The Section 727(a)(3) Claim (Count V).

Section 727(a)(3) denies a chapter 7 discharge when "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3).  This requires debtors to "produce records that provide enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002).  A creditor does "not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation." *In re Scott*, 172 F.3d 959, 969 (7th Cir. 1999) (quoting *In re Juzwiak*, 89 F.3d 424, 430 (7th Cir. 1996)).  Where a debtor is "sophisticated in business, and carr[ies] on a business involving significant assets, creditors have an expectation of greater and better record keeping." *Union Planters Bank*, 283 F.3d at 899 (quoting *Scott*, 172 F.3d at 970).

The language of the statute "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *Scott*, 172 F.3d at 969 (citing *Juzwiak*, 89 F.3d at 429).  However, the extent of necessary record-keeping depends on the circumstances. "Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3)." *Juzwiak*, 89 F.3d at 428.  The court in *Scott* acknowledged that most "consumer-type bankruptcies with no assets or business affairs to speak of . . . do not implicate § 727(a)(3)," but found that "where debtors

are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping." 172 F.3d at 970 (citing *Juzwiak,* 89 F.3d at 428). Indeed, the statute itself provides exception where "such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3).

While section 521(a) requires debtors to prepare and file certain schedules, the "Code does not require production of supporting records unless and until a case trustee or creditor requests them." *Nelson v. Zarling (In re Zarling),* 628 B.R. 624, 637 (Bankr. N.D. Ill. 2021). As noted by several courts, "§ 727 is not appropriately used as a trap to deny a discharge to consumer debtors or business operators who, through inadvertence, lack of competence, or both, maintain less than pristine business records." *Wolff v. Munni (In re Munni),* No. 10-0633PM, 2011 Bankr. LEXIS 1918, at *6 (Bankr. D. Md. May 17, 2011) (quoting *In re Caron,* 411 B.R. 706, 711-12 (Bankr. D. Ore. 2008)); *see also Union Planters Bank,* 283 F.3d at 901 ("It remains within the discretion of a bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist.").

There is no evidence that the Debtor concealed, destroyed, mutilated, falsified, or failed to preserve records he should be expected to maintain. The Plaintiffs have not identified any request made in this chapter 7 case for the Debtor's records that were not produced. The Debtor has not been shown to be "sophisticated in business . . . or carr[ied] on a business involving significant assets." *Union Planters Bank,* 283 F.3d at 899 (quoting *Scott,* 172 F.3d at 970). On the contrary, the record strongly suggests the opposite to be the case, depicting what appears to have been a rag-tag collection of unsuccessful business ventures operating on a shoestring.

The Plaintiffs argue in their post-trial brief that the Debtor "failed to keep any books and records of his businesses which would allow a creditor to track Defendant's financial dealings." (ECF No. 84 at 2.)  In support of this, the Plaintiffs point out that the Debtor testified at trial that he was "not sure" what happened to the $13,170.30 paid to Element Restoration in October 2015 and was uncertain about what happened to the $5,000 personal injury settlement he received some time in 2020. (*Id.*)  But the Plaintiffs limited their case on this point solely to the Debtor's responses to cross examination at trial.  In doing so, the Plaintiffs fail to address the explanation the Debtor offered from the stand regarding his use of funds.  For example, while questioned by the Plaintiffs' attorney, the Debtor testified:

> Q: Did you -- what did you do with the money that the Harrises gave you?
> A: I put it in my bank account, in my business checking account.
> Q: And what did you eventually do with it after that?
> A: I bought materials with it.
> Q: How much were the materials?
> A: I'm not sure. I don't have it in front of me.
> Q: Was there money left over after the materials?
> A: Yes.
> Q: And what did you do with that money?
> A: Left it in the bank account. Left it in the checking account.
> Q: So is it still there today?
> A: I no longer have a checking account. My bank -- my business is closed.
> Q: All right. So what eventually happened to that money when you closed the account?
> A: I'm not sure.

(Tr. at 40.)  At that point, Plaintiffs' counsel abandoned this line of questioning to ask the Debtor about his communications with the subcontractor and the Harrises regarding the home repair project.  None of the Plaintiffs' questions addressed the Debtor's record-keeping.  The Debtor's response that he did not "have it in front of me," suggests that there might be documents recording the disposition of funds.  Yet, Plaintiffs' counsel asked no

question about what those documents might be or any questions about the existence or non-existence of records.

The Debtor was questioned about bank statements for June 1, 2020, through August 31, 2020, for a business account Mildew911 maintained at Azlo Business, Inc. (Ex. P.) Referencing these statements, the Plaintiffs argue for the first time in in their post-trial brief that the Debtor "only provided monthly statements from his business account for the months of June, July, and August of 2020." (ECF No. 84.)  However, they did not present evidence for this allegation.  At trial, the Plaintiffs' attorney asked the Debtor if he was familiar with Exhibit P, to which he responded that it was "an old bank statement for Mildew911, LLC." (Tr. at 89.)  Once again, the examiner moved on to another topic and failed to elicit foundation for Exhibit P or testimony about the Debtor's knowledge about the company's (or the Debtor's) bank records or record-keeping.[10]  For example, while the Plaintiffs elicited testimony (referencing a business account record apparently provided to the Plaintiffs) that Foster's partner authorized Mildew911 to pay McHenry County $428 on account of the body attachment, this event does not evidence — and no other convincing proof has been adduced as to — the Plaintiffs' claim that the Debtor himself "used" the business account for his personal expenses. (ECF No. 84 at 2.)

The Plaintiffs failed to prove that the Debtor transferred, concealed, or dissipated assets of the estate.  Nor have they established what business and financial records were or

---

[10] The documents themselves suggest that the June 2020 statement may have been the first account statement, as the June 1, 2020, thru June 30, 2020, statement says that "Your beginning balance was $0.00." Additionally, the last statement in the exhibit for September 1, 2020 through September 30, 2020 states an ending balance of $2.72.  The Debtor testified that there was no further activity in the account until he "gave the $2.72 to" the Plaintiffs' lawyer sometime in 2020. (Tr. p. 47.)

should have been kept by the Debtor in connection with his personal bankruptcy, but which he kept or concealed, destroyed, mutilated, or falsified.  Accordingly, the court finds that the Plaintiffs have not met their burden and the Debtor may not be denied a discharge under section 727(a)(3).

### 3.  The Section 727(a)(4)(A) Claim (Count VI).

Section 727(a)(4) provides grounds to object to discharge where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4).  This requires a showing by the preponderance of the evidence that "the debtor made a materially false statement under oath, the debtor knew the statement was false, and the statement was made with fraudulent intent." *In re Chlad*, 922 F.3d 856, 861 (7th Cir. 2019).  A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Id.* at 863 (quoting *Lardas v. Grcic*, 847 F.3d 561, 570 (7th Cir. 2017)).  Fraudulent intent requires more than "simple negligence or innocent misunderstandings," but "may be based on inferences drawn from a course of conduct" such as a pattern of omissions demonstrating a "reckless disregard for the truth." *Id.* at 862 (quoting *Kempff*, 847 F.3d 444, 449 (7th Cir. 2017); *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011); *Matter of Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992)).

In support of their section 727(a)(4) claim the Plaintiffs argue in their post-trial memorandum that the Debtor knowingly or with reckless disregard for the truth provided in his bankruptcy schedules "incomplete information regarding his business income, or his

interest in Mildew911 [which] had income and incurred expenses in 2019." (ECF No. 84 at 5.) But the Plaintiffs fail to establish what, if any, specific information the Debtor possessed and was required to disclose but was not disclosed. To the contrary, for example, in response to question 19 of Schedule A/B Property, the Debtor listed as "Non-publicly traded stock and interests in incorporated and unincorporated businesses" his "75%" ownership of "Mildew911 LLC."

Referencing the Defendant's testimony regarding revenue that Mildew911 received in 2019, the Plaintiffs argue that he falsely listed his gross income for calendar year 2019 to be "$0.00" in his Statement of Financial Affairs. However, as discussed in the court's analysis of the section 727(a)(2)(A) claim, the Plaintiffs fail to demonstrate that the Debtor, admittedly only a part-owner of the company, was entitled to moneys paid to Mildew911 or that payments received by Mildew911 otherwise constitute income to him. The Debtor testified without contravention that Mildew911 operated at a loss and that he never received any income from Mildew911. (Tr. at 110.) While the Debtor did testify that Mildew911 paid $428 to McHenry County for his body attachment, the Plaintiffs did not prove that the Debtor knew that the payment was includable as "gross income" for purposes of his Statement of Financial Affairs or that the failure to disclose that amount occurred with fraudulent intent. Similarly, the Plaintiffs failed to demonstrate that the Debtor knew that a $15,448 restitution fine imposed against him, which the Debtor testified his mother paid on his behalf sometime pre-petition, constituted "gross income" to him for purposes of his Statement of Financial Affairs, or that the failure to list it occurred with fraudulent intent. (Tr. at 77.)

Accordingly, the court finds that the Plaintiffs failed to meet their burden with respect to Count VI to prove that the Debtor knowingly and fraudulently failed to list income received and payments made by Mildew911 in 2019 as his income in the statement and schedules he filed with his chapter 7 petition.

4. <u>The Plaintiffs Presented No Actionable Claim under Count VII</u>.

The Plaintiffs seemed to have added a claim for the denial of discharge under 11 U.S.C. § 727(a)(7) almost as an afterthought.  Count VII as pleaded consists of a reference to various paragraphs in preceding counts together with the conclusionary allegation that "Defendant/Debtor's acts committed within one year before the date of filing Defendant/Debtor's petition are sufficient to deny Defendant/Debtor's discharge." (ECF No. 1 ¶ 27.)  Nothing else.

Not surprisingly, the Plaintiffs had nothing to say about their section 727(a)(7) claim in the substantive portions of their post-trial memorandum.  Instead, after obliquely referencing the three section 727 claims addressed in the conclusion to their memorandum ("three . . . conditions"), together with a formulaic nod to "the honest debtor," their conclusion states only the following:  "Therefore, Plaintiffs respectfully request that the Court enter and [sic] Order denying Defendant/Debtor a discharge pursuant to 11 U.S.C. § 727(a)(7)." (ECF No. 84 at 6.)

In doing so, Plaintiffs misread section 727(a)(7).  As Judge Perkins explains:

> The purpose and intent of Section 727(a)(7) of the Bankruptcy Code is to prevent debtors who are involved in several bankruptcy proceedings from failing to cooperate in a proceeding in which their own discharge is not at issue such as a corporate proceeding or a proceeding involving a partner

> or a relative and then, subsequently or simultaneously, obtaining an individual discharge in another case. Section 727(a)(7) is a statutory provision which ties related cases together so that misconduct in one case by an individual may be chargeable against that individual in other related proceedings.

*Associated Bank, N.A. v. Sever (In re Sever),* 438 B.R. 612, 619 (Bankr. C.D. Ill. 2010) (quoting *Whiteside F.S. Inc. v. Siefkin,* 46 B.R. 479, 480-81 (N.D. Ill. 1985)).  To maintain a claim under this section, the plaintiff must establish that the specified misconduct was committed within one year before the filing of the defendant debtor's bankruptcy in connection with a bankruptcy case concerning an insider "filed separately from but related to the debtor's own case."  *Grochocinski v. Morgan (In re Morgan)*, No. 11 A 00580, 2013 Bankr. LEXIS 3304, at *11 (Bankr. N.D. Ill. Aug. 12, 2013) (citing *In re Krehl,* 86 F.3d 737, 741 (7th Cir. 1996)).  This case, however, has not been shown to involve or relate to any bankruptcy other than the Debtor's pending chapter 7 case.   The Plaintiffs' conclusory statement in their final brief notwithstanding, they have presented no basis for relief under section 727(a)(7) and judgment, therefore, must be entered in favor of the Debtor on Count VII.

### B.  Non-dischargeability of the Default Judgment Debt

1. <u>Section 523(a)(2)(A) Claim (Count I)</u>.

Finally, the Plaintiffs argue "in the alternative" that the default judgment should be held to be determined to be non-dischargeable under section 523(a)(2)(A).[11]   Section

---

[11] Although originally plead as Count I of their adversary complaint, the plaintiffs now frame their section 523(a)(2) claim as an alternative to their section 727 claims in their post-trial brief. (ECF No. 84.)  The court has followed the Plaintiffs' current organization for presenting their claims.

523(a)(2)(A) excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). This provision encompasses three separate grounds for excepting the debt from discharge: false pretenses, false representation, and actual fraud. "Scienter, or intent to deceive," is a "'required element under section 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud.'" *In re Freund*, 714 F. App'x 595, 597 (7th Cir. 2018) (quoting *In re Yotis*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016)).

The Plaintiffs allege in Count I that Debtor obtained $13,170 from them based on his "false representations." In order to prevail under section 523(a)(2) for false representation, the Plaintiffs must prove: "(1) that [the debtor] made a false representation or omission, which he either knew was false or made with reckless disregard for the truth; (2) that [the debtor] possessed an intent to deceive or defraud; and (3) that [the plaintiff] justifiably relied on the false representation." *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011). A broken promise of future performance ordinarily will not support relief under section 523(a)(2)(A). *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1017-18 (Bankr. N.D. Ill. 1996). Such a promise "constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it." *Sullivan v. Ratz*, 551 B.R. 338, 345 (N.D. Ill. 2016) (quoting *In re Casali*, 517 B.R. 835, 843 (Bankr. N.D. Ill. 2014)); *see also Clark v. McCurdy (In re McCurdy)*, No. 17-80033, 2019 WL 2343773, at *6 (Bankr. C.D. Ill. May 31, 2019) ("Courts have recognized that a contractor's failure to perform as

promised, standing alone, gives rise to a claim for breach of contract, but not actionable fraud, misrepresentation, or false pretenses under section 523(a)(2)(A).").

In their post-trial brief, the Plaintiffs make two types of argument under section 523(a)(2)(A). First, they argue that the Debtor misrepresented that he would personally perform all work and would not hire or use any subcontractor. However, they failed to demonstrate that the Debtor ever made such representation. To the contrary, Mrs. Harris testified that she merely "assumed" the Debtor would personally perform all work and admitted that "Nothing was mentioned" regarding hiring subcontractors. (Tr. at 26.) Her erroneous assumption, however, is not a false representation made by the Debtor. *See Davis*, 638 F.3d at 553. There was no testimony to suggest that the Debtor made any representation that the work would be performed directly by him or his company. The written agreement signed by Mr. Harris does not specify one way or the other whether Element Restoration would perform the work itself or hire a subcontractor for the job. (Ex. 2.)

The Plaintiffs did not demonstrate that the Debtor made a false representation on which they relied concerning who would be performing the actual repair work. They also failed to prove the Debtor's intent to deceive or defraud them by bringing in a subcontractor for the project, or that the identity of the laborers was a representation of material fact that Mr. Harris relied on when he signed the agreement. Accordingly, the court finds that the

Plaintiffs have not established that the Debtor falsely represented to them that he would not hire a subcontractor for the repairs to their home.[12]

Additionally, the Plaintiffs assert in their post-trial memorandum that that the Debtor entered into the contract "never intending to complete the work." (ECF No. 84 at 6.) However, in general, "[f]ailure to keep a promise does not mean that the promise was fraudulent." *Lennox v. Udelhoven (In re Udelhoven)*, 624 B.R. 629, 647 (Bankr. N.D. Ill. 2021). Rather, "to establish fraud under § 523(a)(2)(A) in cases specifically involving contractor-debtors," the plaintiffs must "show[] that the contractor executed the contract *never* intending to comply with its terms." *Santiago v. Hernandez (In re Hernandez)*, 452 B.R. 709, 723 (Bankr. N.D. Ill. 2011) (emphasis added). "[T]he fact that [the debtor] did not complete the project . . . is not evidence that he never intended to do so." *Udelhoven*, 624 B.R. at 648.

The Plaintiffs failed to prove that the Debtor did not intend to complete the project at the time when his company entered into the contract with the Harrises.[13] Indeed, the evidence suggests just the opposite: the Debtor substantially performed under the contract, expending both money and manpower to perform the work contracted for before the project

---

[12] Although not argued by the Plaintiffs, the court also concludes that the Plaintiffs have not shown a fraudulent omission to support their section 523(a)(2) claim. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Asher v. Petti (In re Petti)*, No. AP 19-00592, 2022 WL 3973380, at *2 (Bankr. N.D. Ill. Aug. 31, 2022) (quoting *Haugland v. Eisenstein (In re Eisenstein)*, 525 B.R. 428, 436-37 (Bankr. N.D. Ill. 2015)). Here, there is no evidence to suggest that the Debtor was aware of the need to correct Mrs. Harris' mistaken assumption or that he intended her to remain under a false impression about who would be performing the repairs.

[13] Since there has been no argument to the contrary by the Debtor, the court will assume without finding that the Debtor could be liable for false representations made in connection with the contract, even though the contract was between the Plaintiffs and Element Restoration. (*See* Def. Ex. 2.)

Page 26 of 29

stopped.   The evidence shows that the Debtor ordered and oversaw the delivery of the construction supplies and material, including roofing and gutters. (*See* Tr. at 37-38, 40, 114; Ex. 3.)  The Debtor credibly testified to visiting with the Harrises to go over color selection for the roofing and arranging with the supplier to change the order when the Harrises were not satisfied with the original color.  The evidence also suggests that Element Restoration hired the subcontractor to install the new roof. (ECF No. 76 ¶ 2.)  Mrs. Harris testified that the roof portion of the project was completed during Foster's supervision of the project. (*See* Tr. at 27; Ex. 4.)[14]  The parties have stipulated that the subcontractor failed to complete the siding portion of the job. (ECF No. 76 ¶ 4.)[15]  Thus, the court cannot conclude from the evidence presented that the Debtor had no intention of completing the repairs at the time of the contract. *See McCurdy*, 2019 WL 2343773, at *7 ("Partial performance negates an inference of fraudulent intent, an intent not to keep a promise at the time it was made."); *Udelhoven*, 624 B.R. at 648.

For these reasons, the Plaintiffs did not satisfy their burden to prove that the judgment debt owed to them should be non-dischargeable under section 523(a)(2) and, accordingly, judgment will also be entered in favor of the Debtor on Count I.

---

[14] The Debtor also testified that, before the repairs were finished, he was told not to return to the Plaintiffs' residence after the altercation with Mrs. Harris' son. (Tr. at 39, 42.)  Although this may provide some explanation for why the Debtor was unable to complete the contract, the court does not rely on this fact in reaching its decision.

[15] Although the Plaintiffs argue in their post-trial brief that Debtor "failed to complete the roof," (ECF No. 84 at 5), the evidence presented at trial shows that the roof replacement was completed, (Ex. 4), consistent with the stipulation of the parties.  Nevertheless, although it is not apparent from the face of the contract, the parties stipulated that the Debtor's company was hired to perform repairs to both the roofing and the siding at the plaintiffs' residence. (ECF No. 76.)  It also appears to be undisputed that the repairs to the siding were not completed.  Therefore, the court considered whether the debt is non-dischargeable due to the failure to complete the entire repair project—not just the roof.

2. Abandoned Claims (Counts II and III).

The plaintiffs did not amend their complaint when given the opportunity to do so at trial. (*See* Tr. at 16.)  Nevertheless, the Plaintiffs failed to raise and address at trial or in their post-trial memorandum their pleaded claims for exempting their debt from discharge under 11 U.S.C. § 523(a)(2)(B) (money obtained by use of a statement in writing) and 11 U.S.C. § 523(a)(6) (willful and malicious injury to another entity or the property of another entity), respectively Counts II and III of their Complaint.  Accordingly, those claims are deemed abandoned. *See, e.g.*, *In re Chardon, LLC*, No. 13-B-81372, 2015 Bankr. LEXIS 3276, at *30 n.15 (Bankr. N.D. Ill. July 1, 2015) (argument hinted at in pleadings but not argued at trial deemed waived); *O'Neil v. New England Rd., Inc.* (*In re Neri Bros. Constr. Corp.*), 593 B.R. 100, 114 n.8 (Bankr. D. Conn. 2018) ("[It] is well settled that a failure to brief an issue is grounds to deem the claim abandoned."); *United States v. Kirkland*, 567 F.3d 316, 322 (7th Cir. 2009) (noting as general matter that courts "are not in the business of formulating arguments for the parties" and "need not try to imagine every plausible argument that could be extracted from an attorney's comments.").  The court will further note that section 523(a)(2)(B) by its express terms requires a materially false statement in writing respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(B).  Here, however, the written "contract" upon which the Plaintiffs base their section 523(a)(2)(B) claim contains no such statement or representation and the Plaintiffs have neither identified nor submitted proof of any other writing by which money, property, services or extension, renewal or refinancing of credit was obtained.  Additionally, the Plaintiffs have not offered proof of any "injury" other than possibly the failure to complete

the construction contract. *But see, e.g., Radivojevic v. Pickens (In re Pickens)*, No. 98-1985, 2000 U.S. App. LEXIS 18778, at *4 (7th Cir. Aug. 1, 2000) (explaining that section 523(a)(6) "is intended to prevent the discharge of debts incurred as a result of intentional torts," not a "state court judgment . . . .based upon a breach of contract"). "[A] claim for breach of contract - even if the breach is allegedly 'intentional' - will not sustain a non-dischargeability objection under section 523(a)(6)." *Ferris, Thompson & Zweig, Ltd. v. Esposito (In re Esposito)*, No. 20-96031, 2022 Bankr. LEXIS 624, at *6-7 (Bankr. N.D. Ill. Mar. 9, 2022).

## CONCLUSION

Accordingly, judgment will be entered in favor of the Debtor against Plaintiffs on all counts. A separate judgment will be entered pursuant to Bankruptcy Rule 7058 giving effect to the determinations reached herein.

DATE: November 23, 2022

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge